UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 14-21896-CIV-ALTONAGA/O'Sullivan

**VERNITTA GETER**, *et al.*,

    Plaintiffs,
vs.

**GALARDI SOUTH ENTERPRISES, INC.**, *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Fly Low, Inc.'s ("Fly Low['s]") Motion to Decertify . . . ("Motion") [ECF No. 244], filed April 20, 2015.[1] Plaintiffs filed a Response . . . ("Response") [ECF No. 253] on May 4, 2015. Fly Low filed a Reply . . . ("Reply") [ECF No. 272] on May 14, 2015. The Court has carefully considered the parties' written submissions and applicable law.

### I. INTRODUCTION

This matter arises out of a dispute over allegedly unpaid wages owed to Plaintiffs, who worked as adult entertainers in the King of Diamonds ("KOD") club. (*See generally* Complaint [ECF No. 1]). Plaintiffs seek compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. section 201 *et seq.* (*See generally id.*). The Court previously granted conditional certification of a class in this matter. (*See* Order [ECF No. 120]). Fly Low now seeks to decertify this conditional class on the ground Plaintiffs are not similarly situated. (*See generally* Mot.).

---

[1] While only Fly Low filed the Motion, the record indicates other parties, including those who have failed to answer, may also be liable; the Court refers to all such parties by the general term "Defendants."

Until 2014, Fly Low owned KOD, a Miami night club. (*See id*. 1). At KOD, exotic dancers received service charges from customers in return for, among other things, "table-side and VIP-area dances . . . ." (*Id*. 5). Plaintiffs did not receive any wages from Fly Low in return for their services because Fly Low classified them as independent contractors, not employees. (*See* Resp. 1). The question raised by the Motion is whether Plaintiffs are sufficiently similar to proceed against Defendants in a collective action, or whether instead they must pursue their claims individually. (*See generally* Mot.).

In addition to the question of decertification, the parties disagree over the timeliness of some of the submitted notices of consent to join; the issue is raised by Fly Low in an Objection . . . ("Objection") [ECF No. 241], filed April 7, 2015. Plaintiffs filed a Response . . . ("Objection Response") [ECF No. 247] on April 21, 2015. Fly Low filed a Reply . . . ("Objection Reply") [ECF No. 251] on April 27, 2015.

## II.  LEGAL STANDARD

The FLSA permits a plaintiff to bring a collective action on behalf of similarly situated persons subject to the requirement that prospective plaintiffs file a written consent in the court where the action is brought. *See* 29 U.S.C. § 216(b); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir. 2001) (citations omitted). At the conditional certification stage, the Court must satisfy itself there are other employees who (1) are similarly situated with regard to their job requirements and pay provisions, and who (2) desire to opt into the case. *See Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567–68 (11th Cir. 1991). Regarding the first requirement, plaintiffs bear the burden of proving they and the class they seek to represent are similarly situated. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996). To evaluate whether a plaintiff has demonstrated the existence of a similarly situated class, courts in the

Eleventh Circuit utilize a two-tiered procedure with distinct burdens at different stages of the litigation process. *See Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003) (citations omitted).

> The first tier is referred to as the "notice stage." *Id.* (citation omitted).
>
> At the notice stage, the district court makes a decision — usually based only on the pleadings and any affidavits which have been submitted — whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

*Id.* (citation omitted).

The second tier of analysis — at issue in the Motion — re-examines the question of certification after discovery is complete. *See id.*

> At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives — i.e. the original plaintiffs — proceed to trial on their individual claims.

*Id.* (citation omitted).

In opposing a motion for decertification, Plaintiffs bear the burden of proving class members are "similarly situated." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007) (citations and internal quotation marks omitted); *see also id.* at 953. "[A]lthough the FLSA does not require potential class members to hold identical positions, . . . the similarities necessary to maintain a collective action under [section] 216(b) must extend beyond the mere facts of job duties and pay provisions." *Id.* at 953 (alterations added; internal citations and quotation marks

omitted). The Court's determination is reviewed for abuse of discretion. *See id.* at 953–54 (recognizing the district court's "range of choice" in addressing a motion for decertification (citation and internal quotation marks omitted)).

The decertification decision is based on the following factors: "1) the disparate factual and employment settings of the individual plaintiffs; 2) the various defenses available to defendants that appear to be individual to each plaintiff and 3) fairness and procedural considerations." *Pendlebury v. Starbucks Coffee Co.*, 518 F. Supp. 2d 1345, 1349 (S.D. Fla. 2007) (citation omitted).

> A plaintiff may satisfy its burden by providing sufficient evidence showing that the employer engaged in a policy or pattern of FLSA violations. Thus a plaintiff can demonstrate that other employees are similarly situated by pointing to a common scheme, plan, or policy. . . . Alternatively, a plaintiff may establish that others are similarly situated without pointing to a particular plan or policy if the plaintiff makes some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions. . . . Ultimately[,] the Court must determine whether, based upon the particular facts of the case, the similarities among the putative class members are sufficient so that it is more practical, efficient, and fair to proceed as a collective action rather than requiring separate actions.

*Mathis v. Darden Restaurants*, No. 12-61742-CIV, 2014 WL 4428171, at *2 (S.D. Fla. Sept. 1, 2014) (alterations added; brackets and internal citations and quotation marks omitted).

The quantum of proof required to maintain certification lies within the Court's discretion. *See Anderson*, 488 F.3d at 953 ("We also need not specify how plaintiffs' burden of demonstrating that a collective action is warranted differs at the second stage. It is sufficient to conclude . . . that at the second stage plaintiffs *may* — the ultimate decision rests largely within the district court's discretion — not succeed in maintaining a collective action . . . based solely on allegations and affidavits, depending upon the evidence presented by the party seeking decertification." (alterations added; emphasis in original)).

## III. ANALYSIS

The Court addresses the several objections Fly Low has to certification of Plaintiffs' proposed collective class below, and concludes Plaintiffs have met their burden regarding certification. The Court then confronts the issue of the timeliness of the opt-in Plaintiffs' submission forms.

### A. Fly Low's Motion to Decertify

The parties dispute the significance of a number of facts that potentially bear on the question of decertification. (*See generally* Mot.). Fly Low argues, "At best, a collective action would offer no 'efficiencies,' and would present the same manageability difficulties that separate, individual civil actions would." (*Id*. 6). The Court addresses Fly Low's contentions, based on the three factors cited in *Pendlebury*, in turn.

#### 1. Disparate Factual and Employment Settings

*Amounts earned and dates of performances*. Fly Low makes much of the fact each Plaintiff "will have to testify about the number of hours she performed (including any overtime hours performed), . . . the dates/period of time each entertainer performed at KOD, and the amount of money earned and paid [] out by each entertainer during each workweek . . . ." (*Id*. 5 (alterations added); *see also id.* 8–9). It also says some Plaintiffs did not work enough to earn overtime wages (*see id.* 8–9), and the house fees and tip-outs vary among Plaintiffs (*see id.* 9–11). This, Fly Low argues, indicates the need to conduct "highly [] individualized factual determinations" as to each Plaintiff. (*Id*. 5 (alteration added; emphasis omitted)).

These differences do not merit decertification. It is highly unlikely any real-world collective action would involve opt-in Plaintiffs with the same, or even similar, schedule and earnings. *Cf. Hughes v. Burie*, No. 3:12-CV-332-RS-CJK, 2014 WL 1572543, at *3 (N.D. Fla.

Apr. 18, 2014) ("The plaintiffs' different periods of employment, however, is not an absolute bar to a finding that they were all similarly situated." (citation omitted)). Further, it is unclear why these identified differences impact this factor of the decertification test; after all, even if a group of plaintiffs had the same hours of performance, hours of overtime, dates they performed, and amounts they earned and paid, plaintiffs would still be required to offer testimony on all of these facts in order to establish a *prima facie* case. Fly Low provides no authority differences in back wages owed requires decertification (*see generally* Mot.), and nothing in the text of the FLSA compels it. The identified differences are thus irrelevant to the decertification decision in this matter. *Cf. Houston v. URS Corp.*, 591 F. Supp. 2d 827, 832 (E.D. Va. 2008) (granting in part conditional class certification of FLSA action and noting, "That is not to say that there can be no differences among class members or that an individualized inquiry may not be necessary in connection with fashioning the specific relief or damages to be awarded to each class member.").

*Different policies about performing*. Fly Low contends that the "different rules" applied to Plaintiffs, such as the amount of the house fee and number of days Plaintiffs had to work, weigh in favor of decertification. (Mot. 7). It argues one Plaintiff was "subjected to an entirely different set of rules/policies than other entertainers because she was a 'house' entertainer who made a lot of money." (*Id.* 8 (citation omitted)). This involved more severe fines and discipline for rule violations than other, non-"house" entertainers. (*See id.*). Fly Low does not explain the relevance of these distinctions to the disparate factual and employment settings factor. (*See id.*). Regardless, the Court does not find these distinctions merit decertification, as they appear to impact the amounts potentially owed for back wages (that is, higher improper "fines" would merit additional compensation for back wages). As previously stated, these relatively straightforward determinations are permissible in this case.

*Different job duties*. Plaintiffs had different job duties, such as pole dancing or performing in a VIP room. (*See id.* 11–12). Fly Low argues this means certain entertainers "had greater opportunities for tips from high-profile customers, and would frequently earn more money than other entertainers." (*Id.* 12). For the reasons explained, however, Plaintiffs' different earnings are insufficient to warrant decertification. Furthermore, the Court has not been presented evidence distinctions in job duties are significant enough to make a collective action unwieldy or overly complicated. The different job duties all involve performing at KOD and do not appear to concern the central dispute of the case — whether Plaintiffs were independent contractors or are owed unpaid wages. Instead, they appear irrelevant to any cognizable legal dispute.

*Other considerations*. Fly Low argues various other differences exist, such as the fact Plaintiffs were charged varying amounts by KOD for each night they performed and some claimed to have been disciplined or fined by the club's managers (*see id.* 13–15). Most of these relate to the issue of computation of damages, which has already been addressed in this Order. One contention, however, merits further discussion: the fact some Plaintiffs "signed written independent contractor agreements . . . ." (*Id*. 14). Fly Low says these agreements "will (or should) affect the counterclaims asserted . . . against the Plaintiffs . . . ." (*Id.* (alterations added)). Presently three counterclaims remain: money had and received; unjust enrichment; and breach of contract. (*See* Order [ECF No. 108]).

According to the Amended Counterclaim [ECF No. 82], Plaintiffs represented to Fly Low they were independent contractors and would perform as such at KOD. (*See id.* ¶ 13). Fly Low allowed Plaintiffs to keep "certain service charges which KOD charged to its customers . . . less certain deductions." (*Id.* ¶ 14 (alteration added)). Plaintiffs kept as tips "amounts paid in excess

7

of these minimums . . . ." (*Id.* ¶ 15). Fly Low alleges Plaintiffs violated their agreements with it by filing the lawsuit and may not retain the minimum service charges while demanding hourly compensation from Fly Low. (*See id.* ¶¶ 16–17). It further claims if Plaintiffs prevail on their claims, it is entitled to recover the difference between the service charge and the minimum wage. (*See id.* ¶ 18).

While the agreements may impact these counterclaims, Fly Low provides no authority differences in a party's *counterclaims* — claims not based on the FLSA — should impact the Court's decision on a motion to decertify an FLSA collective action. (*See generally* Mot.). It asserts this difference will create "manageability problems" (*id.* 14), but does not elaborate in what manner these problems are expected to arise. Regardless, the Court determines any manageability problem is minimal, given the fact some Plaintiffs signed agreements will only affect a small portion of this overall dispute.

2. *Individualized Defenses to Claims*

*Statute of Limitations*. Fly Low argues Plaintiffs will be affected differently by the statute of limitations, depending on when they started performing; whether they assert willful violations of the FLSA; and, for later-added Plaintiffs, when they filed a notice of consent to join. (*See id*. 15–16). Fly Low provides no authority in support of this argument, and the Court finds it is substantially similar to the arguments made about differences in Plaintiffs' earnings, which the Court has already rejected. Different limitations periods, if any, relate primarily to the amount of back wages recoverable by Plaintiffs, not any fundamental issue of liability of Defendants. This contention thus does not compel decertification. *Cf. Moss v. Crawford & Co.*, 201 F.R.D. 398, 411 (W.D. Pa. 2000) (noting "the statute of limitations will not be a particular defense raised against a specific plaintiff; rather it will be asserted against every member of the

class. Decertification would require the court to perform the statute of limitations analysis in over seventy separate lawsuits and would be an inefficient use of this court's limited time.").

*Set-offs*. Among the different defenses asserted, Fly Low contends the different amounts of service charges Plaintiffs earned create differing set-off defenses. (*See* Mot. 16). Assuming the validity of these set-off defenses, however, the Court does not find these differences sufficiently substantive to warrant decertification. The set-off determination will involve a relatively simple calculation of money, and the question whether Plaintiffs' claims are in fact subject to a set-off would appear to apply equally across all Plaintiffs. Furthermore, if Plaintiffs are found to be entitled to back wages, Defendants seeking a set-off "bear the burden of proving the amount of the mandatory minimum dance fees retained by" Plaintiffs. *Ruffin v. Entm't of the E. Panhandle*, No. 3:11-CV-19, 2012 WL 761658, at *3 (N.D.W. Va. Mar. 7, 2012). If Defendants are unable to identify evidence sufficient to meet their burden, they would be unable to claim set-offs; as such, this ground for decertification may not be relevant at trial.[2]

*Creative, Artistic Professional Exemption*. In certain instances a creative professional is exempt from the protections of the FLSA. *See* 29 C.F.R. § 541.302. Fly Low contends this determination "is always individualized and fact specific" and the differences in Plaintiffs' earnings complicate the analysis. (Mot. 16–17). In the context of adult entertainment, at least one court has held exotic dancers were not exempt professionals under the FLSA. *See Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1354 (M.D. Fla. 1997) (alteration added).

To the extent Fly Low's argument is based upon the exemption's requirement of having earned a threshold amount per week, the Court is not persuaded this determination would prove

---

[2] Furthermore, while not raised by Plaintiffs, it appears an employer must distribute any service charges directly to employees in order to offset minimum wage liability. *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 929 (S.D.N.Y. 2013) (citing 29 C.F.R. § 531.55(b)). It is unclear whether this actually occurred with Plaintiffs, and thus Fly Low's claimed set-offs may not be an issue at trial.

any more challenging than the calculation of back wages owed; as repeatedly stated, this calculation does not merit decertification. *See* Section III.A.1, *supra*. To the extent Fly Low's argument concerns differences in Plaintiffs' imaginative artistry on stage, *see* 29 C.F.R. § 541.302(c) ("The requirement of 'invention, imagination, originality or talent' distinguishes the creative professions from work that primarily depends on intelligence, diligence and accuracy."), the Court is not persuaded the identified differences among Plaintiffs — such as types of performances and job titles — will create manageability problems. The differences do not appear significant. (*See, e.g.,* Mot. 11 (noting some performers were not "pole dancers"; some were; and some were "high-flying, acrobatic pole dancers" (citations and internal quotation marks omitted))). If the exemption applies to any or all Plaintiffs, this determination will not be hampered by proceeding as a collective action. *Cf. Pendlebury*, 518 F. Supp. 2d at 1362 ("[E]very class under § 216(b) will have differences; however, class members need only be similar, not identical. If Defendants' contentions that the class must be similar in almost all respects was to prevail, the intent behind class certification under § 206(b) would be frustrated and the statute's class provisions would be effectively emasculated." (alteration added; footnote call number omitted)).

### 3. *Fairness and Procedural Concerns*

Finally, Fly Low seeks decertification on the ground a collective action will be unmanageable, in part because "Plaintiffs have not shown how the testimony of a representative class of entertainers can be extrapolated over the entire class of entertainers . . . ." (Mot. 17). However, the authorities it cites in support of this proposition do not apply to the present dispute. For instance, *Rindfleisch v. Gentiva Health Services, Inc.* stands for the unremarkable proposition a class of plaintiffs seeking solely overtime wages cannot be certified when some

members of the proposed class are not entitled to overtime wages. *See* 22 F. Supp. 3d 1295, 1304 (N.D. Ga. 2014) ("The Court cannot determine a proper amount of overtime damages if this matter proceeds as a collective action when a number of Plaintiffs did not actually work overtime while employed by Gentiva."). And *Ledbetter v. Pruitt Corp.*, in which a court declined conditional certification in part because of the need for individualized analysis of each plaintiff's claim, is inapposite because the plaintiffs sought to certify a class comprising "all current and former employees employed by Pruitt in all of its facilities throughout the State of Georgia employed on or after March 1, 2003." No. 5:05-CV-329 (CAR), 2007 WL 496451, at *3 (M.D. Ga. Feb. 12, 2007). A certified class would have been able to include plaintiffs from at least three facilities, *see id.*, whereas the present action involves only claimants from one facility. (*See* Resp. 1; Reply 2).

Fly Low further contends the Court will be unable to manage the case because of "individualized liability determinations and damages calculations . . . ." (Mot. 18 (citation omitted)). Fly Low includes this statement among case law citations concerning the lack of a "common plan or policy" emanating from Defendants. (*See id.*). However, it fails to persuasively demonstrate Defendants lacked a common plan or policy concerning the classification or handling of Plaintiffs. (*See generally id.*). Indeed, from the information provided to the Court, it appears Plaintiffs received substantially the same treatment with regard to the terms of their employment. (*See, e.g.,* Resp. 1 (noting "a singular decision made by Defendant to classify Plaintiffs, and all entertainers who performed at the club, as independent contractors, not employees")).

*4. Plaintiffs' Burden*

While the foregoing discussion rejects Fly Low's grounds for decertification, the burden remains with Plaintiffs to prove certification is appropriate. *See Anderson*, 488 F.3d at 952 (citations omitted). In particular, the Court must be satisfied the class of Plaintiffs is "similarly situated":

> The determination of whether individual plaintiffs have disparate factual and employment settings may involve a variety of considerations, including . . . (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographic location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; and (5) the extent to which the actions which constitute the violations claimed by plaintiffs are similar.

*Mathis*, 2014 WL 4428171, at *3 (alteration added; citation omitted).

The Court is satisfied Plaintiffs are similarly situated enough to warrant a collective action. Plaintiffs performed substantially the same job (*see* Resp. 1), although it is true certain Plaintiffs appear to have had much greater earning potential than others (*see* Mot. 10–11). Plaintiffs worked in the same location and the alleged violations took place during the entirety of Plaintiffs' time at KOD. (*See* Resp. 1; Mot. 7). All Plaintiffs were subjected to similar policies and practices that were apparently established in a similar manner by management. (*See* Resp. 4–5 (noting all entertainers were required to pay house fees for the right to work; share tips and earnings with others; and charge set fees for certain services)).

Finally, if FLSA violations occurred, they appear to have been effectuated in a similar manner. (*See id.* 4 (arguing Fly Low "engaged in a uniform policy of misclassifying its entertainers")). This is an important consideration, for when a "policy applies . . . generally, the class members' individual job duties are not relevant to whether they are similarly situated with respect to the *application of this policy*." *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 390

(W.D.N.Y. 2005) (alteration and emphasis added) (granting conditional certification). It is clear the similarities among Plaintiffs extend far beyond their job duties and pay provisions. *See Anderson*, 488 F.3d at 953 (citations omitted).

Fly Low argues the determination of independent contractor status differs among Plaintiffs because some signed independent contractor agreements and others did not. (*See* Reply 4–6). Fly Low concedes the "economic realities of the [p]arties' relationship will ultimately control" but nevertheless argues the agreements are a "significant evidentiary admission . . . ." (*Id.* 5 (alterations added)). Fly Low provides no authority concerning this "evidentiary admission" argument (*see generally id.*), and the fact certain Plaintiffs signed a document attesting they were "skilled in the discipline of dance" is of little assistance in making the determination whether they are, in fact, independent contractors. (*Id.* 5 (citation omitted)).

This is so because the FLSA's "provisions are mandatory; the provisions are not subject to negotiation or bargaining between employer and employee." *Silva v. Miller*, 307 F. App'x 349, 351 (11th Cir. 2009) (per curiam) (citation and internal quotation marks omitted). The independent contractor "inquiry is not governed by the label put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether the work done, in its essence, follows the usual path of an employee." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) (citation and internal quotation marks omitted). "Putting on an independent contractor label does not take the worker from the protection of the Act." *Id.* (brackets, footnote call number, citations, and internal quotation marks omitted). A contract thus is not itself evidence an individual who would otherwise have been an employee is, in fact, an independent contractor.

Fly Low also contends differences in earnings and hours worked mean this action should not proceed collectively. (*See* Reply 7–8). That back wages owed may be set off by Plaintiffs' gratuities "could potentially result in Fly Low having liability to some, but not all, Plaintiffs for minimum wages, eviscerating Plaintiffs' ability to establish liability on a class-wide basis." (*Id.* 8 (citations omitted)). Even assuming this is true for the purposes of this Motion, the set-offs are asserted by way of affirmative defenses and counterclaims by Fly Low (*see id.* 7), and thus do not impact the *prima facie* liability for FLSA violations. Liability may still be established on a class-wide basis even if set-offs are then proven to reduce, or eliminate, the damages owed.

Fly Low also asserts the differences in Plaintiffs' skill levels and Defendants' control over Plaintiffs creates differences in the independent contractor determination. (*See* Reply 8–9). The Court has previously found the supposed differences in skill levels to be of little importance in this action. *See* Section III.A.1, *supra*. Fly Low also makes a cursory reference to the fact one Plaintiff appears to have been disciplined more harshly for rule violations than others (*see* Reply 8–9), but this appears to be a distinction without a difference. Precise similarity is not required for an FLSA collective action, and the limited factual information provided on these points by Fly Low is insufficient to indicate significant differences among Plaintiffs with regard to their independent contractor statuses.

Nonetheless, the Court is troubled by the fact a trial may be unwieldy, given multiple Plaintiffs will need to testify. Based on the Court's conclusion in Section III.B, *infra*, the Court has calculated 20 additional notices of consent to join were timely filed; however, two of these opt-in Plaintiffs have been dismissed so they can arbitrate their claims. (*See* Order [ECF No. 240]). Courts in this District have declined to decertify actions for a class of nearly 900 plaintiffs, *see Pendlebury*, 518 F. Supp. 2d at 1347, and have decertified actions involving 1) a

class of 20,255 opt-in plaintiffs, *see Mathis*, 2014 WL 4428171, at *4; 2) a class of 160 plaintiffs, *see Stone v. First Union Corp.*, 203 F.R.D. 532, 535 (S.D. Fla. 2001); and 3) a class of only 16 plaintiffs, *see King v. CVS/Caremark Corp.*, No. 07-21824-CIV, 2008 WL 5973490, at *1 (S.D. Fla. Sept. 11, 2008).

Still, courts have emphasized the fairness and procedural concerns of a collective action are influenced by the "factual distinctions and varying evidence among the Plaintiffs . . . ." *Id.* at *5. In particular, the *King* opinion noted the case involved claimants who had worked in up to 27 different store locations, and were supervised by "dozens of store managers and numerous assistant store managers and pharmacists . . . ." *Id.* at *4 (footnote call number and citations omitted). Thus, with regard to fairness and procedural concerns, a collective action would "require an assessment of the specific procedures in that particular pharmacy conducted by the individual manager and/or supervisor who presumably would be called as a witness. On these facts, the collective action would evolve into mini-trials concerning the claims of each Plaintiff . . . ." *Id.* at *5.

In contrast, Plaintiffs here all worked at a single location, performed similar job duties, and were supervised by individuals at one workplace. (*See, e.g.,* Resp. 1).[3] As a result, while certainly individualized determinations of damages will need to occur, the differences in individual Plaintiffs' testimony appears unlikely to go to the question of FLSA liability. In addition, the Court is cognizant this action was filed by multiple original Plaintiffs; therefore, even were the class decertified, a trial would involve similar individualized determinations of many or all of these same questions.

---

[3] The Response indicates policies concerning Plaintiffs' working conditions were "promulgated by or advanced by" two people in particular, known as "K-Rock" and "Disco Rick." (Resp. 14 (citations omitted)). The Reply does not dispute the assertion these two individuals were primarily responsible for the policies applied to Plaintiffs. (*See generally* Reply).

As a result, while the remaining 18 opt-in Plaintiffs will increase the length of the trial in this matter, their addition does not significantly hamper the Court's ability to manage this proceeding or impinge the fairness due to Defendants. Given the unique facts of this case, the limited number of additional opt-in Plaintiffs, and the extensive factual similarities among them, the Court in this instance finds fairness and procedural concerns do not weigh in favor of decertification. As such, the Court exercises its discretion and determines a class is appropriate in this matter. *Cf. Pendlebury*, 518 F. Supp. 2d at 1363 (noting courts should balance collective actions' benefits of lower costs to plaintiffs and efficient resolution of claims with "any potential detriment to the defendant and the potential for judicial inefficiency as a result of collective treatment" (citation omitted)).

### B. Timeliness of Notices of Consent to Join

The Courts now confronts the timeliness of certain notices of consent to join filed by putative opt-in Plaintiffs. (*See, e.g.*, Consent to Join . . . [ECF No. 237]). Fly Low seeks to exclude from this proceeding opt-in Plaintiffs whose notices of consent to join were entered on the docket starting February 3, 2015. (*See generally* Objection). Plaintiffs, however, argue the deadline for submission of opt-in plaintiffs was February 27, 2015, and even individuals who opted in after this date should be permitted to remain in this case. (*See* Objection Resp. 1–2).

On November 26, 2014, by Order ("November 26 Order") [ECF No. 129], the Court established an opt-in period in this case that would conclude "fifty (50) days from the date the Court approves the proposed notice in this case." (*Id.* 2). Regardless of the content of the November 26 Order, however, on December 4, 2014, the Court established a firm deadline by Order ("December 4 Order") [ECF No. 139]. "The deadline for submission of opt-in Plaintiffs for the conditionally certified class is January 23, 2015." (*Id.* 1 (emphasis omitted)).

The December 4 Order says nothing about a 50-day period, because at the December 4, 2014 hearing ("December 4 Hearing") [ECF No. 137], "the Court overruled Plaintiffs' objection concerning Defendants' proposed language" in the notice to potential opt-in plaintiffs. (Dec. 4 Order 1). Indeed, at the December 4 Hearing, the Court specifically asked the parties if the Court had resolved the issue with the notice and whether counsel for Plaintiffs would be able to disseminate the notice, to which counsel for Plaintiff replied on the record, "Yes, ma'am." Even assuming Plaintiffs ignored the December 4 Order's unequivocal deadline and believed the 50-day opt-in period was still in effect, the Court approved the notice at the December 4, 2014 hearing, as counsel for Plaintiffs indicated they would be able to send the notice at that point.[4] Thus, the 50-day opt-in period would have run until January 23, 2015 — conveniently (and intentionally) the date stated in the December 4 Order.

Plaintiffs attempt to obfuscate matters by arguing the notice was not "approved" until January 8, 2015, at which point the Court approved a revised notice that included language concerning a related case and granted Plaintiffs' motion to send the notice by U.S. mail. (*See* Order [ECF No. 169]). Yet the Court never modified the existing January 23, 2015 deadline in that Order or any subsequent order. If the Court had intended to enlarge the time for submission of opt-in Plaintiffs, it would have done so clearly and unequivocally. If counsel for Plaintiffs foresaw a need for such enlargement of time, the proper method of seeking an extension would be by filing a motion, not by waiting and hoping the Court would give effect to late-filed consents at the present juncture.

Nevertheless, Fly Low has previously indicated its belief the opt-in window closed on February 11, 2015, based on a 50-day opt-in window starting December 23, 2014, when the

---

[4] It is thus not the case that as of January 8, 2015, "the Court did not approve the previously submitted Notices" (Objection Resp. 8), as the Court had done so on the record at the December 4 Hearing.

Court approved a slight revision to the notice to be sent to putative Plaintiffs. (*See* Response to Plaintiffs' Motion to Amend Scheduling Order . . . ("February 17 Filing") 3 [ECF No. 199]). The February 17 Filing, however, noted Fly Low did not agree to a February 23, 2015 deadline. (*See id.* 4). Based on this statement — and because the primary purpose of the deadline for opt-in Plaintiffs' submissions is to ensure the availability of a fair defense to the claims — the Court finds it is improper for Fly Low to seek to enforce the original deadline for submission, and therefore accepts notices of consent filed by February 11, 2015.

Plaintiffs further seek to give effect to the late-filed notices on the ground "good cause" exists to allow the late filings and judicial economy would be served. (*See* Objection Resp. 9–10). With regard to permitting late-filed notices in FLSA cases,

> courts have generally decided the question by balancing various combinations of the following factors: (1) whether "good cause" exists for the late submissions; (2) prejudice to the defendant; (3) how long after the deadline passed the consent forms were filed; (4) judicial economy; and (5) the remedial purposes of the FLSA.

*Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 37 (N.D.N.Y. 2009) (citations omitted). Plaintiffs seek to demonstrate "good cause" by noting counsel did not send the notices until after January 8, 2015. (*See* Objection Resp. 9). However, as stated, nothing prevented counsel for Plaintiffs from sending them earlier, starting on December 4, 2014, when the Court approved the language of the notice. Plaintiffs also cite authorities standing for the proposition a missed deadline can be excused if a party complies within a few days (*see id.* 9–15); these authorities are not binding on the Court and are rejected without further discussion.

The Court also determines prejudice to Fly Low would ensue if the late-filed notices were given effect, as Fly Low had significantly less time to plan and conduct discovery with these putative Plaintiffs. Judicial economy — while perhaps superficially served by the inclusion of

more Plaintiffs in a single action — would in fact be significantly harmed by including these late-filed plaintiffs, because the correct determination of an individual plaintiff's claim is not served when the defense has insufficient time to conduct discovery and other related pretrial matters. And while the remedial purpose of the FLSA certainly entails including plaintiffs in a collective action, it does not require the inclusion of all plaintiffs at the expense of a defendant's ability to properly address their claims. Indeed, the purpose of the FLSA — to ensure employees with *valid* claims receive *proper* back wages — would be hampered if defendant-employers were required to address claims from newly added plaintiffs with mere weeks to conduct all discovery. Because good cause has not been shown, prejudice would ensue to the Defendant, and the remedial purposes of the FLSA would be hampered, notices filed after February 11, 2015, will not be given effect, and these putative opt-in Plaintiffs are dismissed without prejudice.

### IV. CONCLUSION

Based on the foregoing analysis, it is

**ORDERED AND ADJUDGED** as follows:

1. The Motion **[ECF No. 244]** is **DENIED**. Plaintiffs will proceed as a class.

2. Notices of consent to join filed after February 11, 2015, are hereby **STRICKEN**.

3. The following plaintiffs are dismissed without prejudice: Chayla Sauls [ECF No. 195]; Latavia Dunlap [ECF No. 213]; Nacory Wright [ECF No. 214]; Tierra Anderson [ECF No. 215]; Montoya Minnis [ECF No. 216]; Rashonda Walton [ECF No. 217]; D'Angela Williams [ECF No. 218]; Kryste Rattler [ECF No. 219]; Yamilee Bennett [ECF No. 220]; Christyona Hartzog [ECF No. 221]; Kristine Glenn [ECF No. 222]; D'Angela Williams [ECF No. 223]; Kenyatta Clay [ECF No. 224];

Breonna Beck [ECF No. 236]; and Samone Williams [ECF No. 237].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of May, 2015.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record